**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

JAMIE LEE W.,[1]

                      Plaintiff,                5:19-cv-00136 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,[2]

                      Defendant.

---

**Appearances:**

*For Plaintiff:*
Lawrence D. Hasseler
Conboy, McKay, Bachman & Kendall, LLP
407 Sherman Street
Watertown, New York 13601

*For Defendant:*
Grant C. Jaquith
United States Attorney
Christopher L. Potter
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, Massachusetts 02203

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Jamie Lee W. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security denying Plaintiff's application for

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

[2] Andrew Saul became the Commissioner of Social Security after this case was filed. (Dkt. No. 13, at 1). Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to add his name to the docket.

Supplemental Security Income ("SSI") Benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 11, 13). After carefully reviewing the Administrative Record,[3] (Dkt. No. 7), and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff applied for SSI benefits on March 26, 2015, alleging that he had been disabled since October 8, 2014. (R. 269–75). The Commissioner denied the claim on May 29, 2015. (R. 85–99). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge ("ALJ") John Barry on January 19, 2018.[4] (R. 35–84, 107). On February 7, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 7–22). Plaintiff then filed a request for a review of that decision with the Appeals Council, which denied review on January 3, 2019. (R. 1–6). Plaintiff commenced this action on February 4, 2019. (Dkt. No. 1).

### B.   Plaintiff's Background and Testimony

Plaintiff was 36 years old when he applied for SSI benefits in March 2015. (R. 86, 269). As a child, he received both inpatient and outpatient mental health care. (R. 475–77). He has spent between 13 and 15 years incarcerated. (R. 44). While in prison, he obtained a GED. (R. 43). Plaintiff can read and write in English. (*Id.*).

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 7), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[4] An initial hearing was held on May 23, 2017. (R. 29–34). ALJ Barry continued the hearing so that records from Plaintiff's treatment at Care Coordination of Northern New York could be requested. (*Id.*).

Plaintiff currently lives in an apartment with his girlfriend. (R. 39–40). He has a driver's license and drives multiple days a week, including to appointments and the grocery store. (R. 41). He is able to do dishes, clean his apartment, do laundry, feed himself, and bathe himself. (R. 59–61). He does not like to socialize, and spends his time watching television and movies and playing computer games. (R. 60–61).

Plaintiff receives benefits such as supplements for food, rent, utilities, and health insurance. (R. 42). He has no other income sources. (*Id.*). He has been employed several times, including most recently at a restaurant in 2014. (R. 42–43). However, he has never held a job for longer than six months. (R. 45).

Plaintiff testified that he cannot work because he suffers from depression, post-traumatic stress disorder ("PTSD"), impulsivity disorder, attention deficit hyperactivity disorder ("ADHD"), and a tremor in his left arm. (R. 47–48). He takes medication for the tremor but does not take any psychiatric medication. (R. 48, 51). He sees Dr. Toby Davis, a psychologist, once a month and has been in treatment with him for the last two and a half years. (R. 50). He also sees a family medicine practitioner for his tremor. (R. 51). He does not currently have any drug or alcohol dependence issues. (R. 54–55).

Plaintiff reports that he is antisocial and does not like interacting with people. (R. 61–62). When asked what would be the main thing that would stop him from being able to work, he answered that it was his mouth, because he has "no filter." (R. 62–63). He does not think before he speaks, and he thinks this has attributed to his failure to hold a job. (R. 63).

### C.    Medical Evidence and Opinions

#### 1.    Dr. Dennis Noia

Plaintiff met with Dr. Dennis Noia, a psychologist, for a consultative examination on April 30, 2015. (R. 421–424). Dr. Noia noted that Plaintiff reported symptoms of depression,

irritability, and problems with memory and concentration. (R. 422). The report also notes that Plaintiff's "manner of relating, social skills, and overall presentation [were] moderately adequate," and he was appropriately dressed and groomed. (*Id.*). Additionally, "[h]is thought processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking." (R. 423). "His attention and concentration was [sic] intact. He was able to do counting, simple calculations, and serial 3s." (*Id.*). Dr. Noia also noted that Plaintiff appeared to have "no limitations in understanding and following simple instructions," "simple tasks," or "maintaining attention and concentration for tasks." (R. 424). However, Dr. Noia also wrote that Plaintiff had "moderate limitations regarding his ability to make appropriate decisions" and "his ability to deal with stress," and "difficulty relating to and interacting well with others." (*Id.*). Dr. Noia further observed that his insight and judgment were "poor." (R. 423). Dr. Noia recommended that Plaintiff begin treatment with Dr. Davis. (*Id.*).

### 2. Dr. Elke Lorenson

On April 30, 2015, Plaintiff also met with Dr. Elke Lorenson, a vascular surgeon, for a consultative neurologic examination. (R. 426–29). Dr. Lorenson noted a tremor in Plaintiff's left arm and leg. (R. 426). Plaintiff had "hand and finger dexterity intact in the right hand, but not on the left hand." (R. 427). He had a 5/5 grip strength for his right hand, but only a 4/5 grip strength for his left hand. (*Id.*). Dr. Lorenson noted that "there are moderate restrictions handling small objects with the left hand" and "moderate restrictions in pushing, pulling, and reaching with the left hand and left arm." (R. 428).

### 3. Dr. Toby Davis

Dr. Davis, a clinical neuropsychologist, has been treating Plaintiff since 2015. (R. 50, 420). On February 24, 2015, Dr. Davis completed a neuropsychological assessment of Plaintiff. (R. 415). The assessment noted Plaintiff had been diagnosed with intermittent explosive

disorder, antisocial personality disorder, and adjustment disorder. (R. 417). Plaintiff was given a neuropsychological assessment battery ("NAB"), which measures "the domains of Attention, Language, Memory, Spatial, and Executive Functions." (*Id.*). Plaintiff's NAB revealed relative "strengths" in the domains of Language, Attention, and Executive Functions. (*Id.*). He performed at an "impaired" level in the Memory and Spatial domains. (*Id.*). His total NAB Index was below average. (*Id.*). His full scale IQ ("FSIQ") was measured as an 83, which is in the 13th percentile. (R. 418).

Plaintiff was also administered a personality assessment inventory ("PAI") "in order to ascertain the reliability of his biobehavioral presentation and to confirm his history." (R. 418). "The configuration of the clinical scales suggests a person with significant tension, unhappiness, and pessimism." (R. 419). Additionally, the assessment noted that Plaintiff "describes himself as a socially isolated individual who has few interpersonal relationships." (*Id.*). The assessment also noted that Plaintiff "describes his temper as within the normal range, and as fairly well-controlled without apparent difficulty." (R. 420). Dr. Davis diagnosed Plaintiff with persistent depressive disorder, PTSD, antisocial personality disorder, and paranoid personality disorder. (*Id.*). Dr. Davis noted that Plaintiff "report[s] a number of strengths that are positive indications for a relatively smooth treatment process, if he were willing to make a commitment to treatment." (*Id.*).

Dr. Davis then began to treat Plaintiff monthly. His notes suggest that many of their sessions focused on Plaintiff's anger issues, impulse control, and his coping mechanisms. (R. 435–37, 445–48, 487–89).

On April 26, 2016, Dr. Davis completed a "medical source statement of ability to do work-related activities (mental)" for Plaintiff. (R. 438–440). He indicated that Plaintiff's "ability

to understand, remember, and carry out instructions" was affected by the impairment, and that Plaintiff's restrictions were "marked" in two areas[5] and "extreme" in four areas.[6] (R. 438). He further opined that Plaintiff's "ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine work setting" were impaired, and Plaintiff's restrictions were extreme in four out of four areas.[7]

On January 4, 2018, Dr. Davis wrote a letter to Plaintiff's counsel opining that Plaintiff "is disabled due in part to multiple psychiatric etiologies." (R. 490). Dr. Davis reported that Plaintiff "has a significant history of antisocial traits (Antisocial Personality Disorder) and Intermittent Explosive Disorder (IED) features" and has "poor memory, retention of information, retrieval of information, and application of information to achieve prosocial results." (*Id.*). Dr. Davis opined that "[i]n view of his repeated run-ins with law enforcement regarding thefts, confrontational interactions with others, and his violent tendencies," Plaintiff "appears to be unemployable in most if not all settings." (*Id.*). In support of this view, Dr. Davis reported that Plaintiff's "self-regulation and self-monitoring skills are poor and this tends to be much of his problem with impulsivity and reckless behavior." (*Id.*). He opined that these problems, "[c]oupled with his disdain for authority figures and explosive anger," mean that Plaintiff "is likely to be introduced to a secure facility before the year is out." (*Id.*). Dr. Davis completed a second "medical source statement of ability to do work-related activities (mental)." (R. 491–93).

---

[5] These areas included Plaintiff's ability to: (1) "[u]nderstand and remember simple instructions" and (2) "make judgments on simple world-related decisions." (R. 438).

[6] These areas included Plaintiff's ability to: (1) "[c]arry out simple instructions," (2) "[u]nderstand and remember complex instructions," (3) "[c]arry out complex instructions," and (4) "make judgments on complex work-related decisions." (R. 438).

[7] These areas included Plaintiff's ability to: (1) "[i]nteract appropriately with the public," (2) "[i]nteract appropriately with supervisor(s)," (3) "[i]nteract appropriately with co-workers," and (4) "[r]espond appropriately to usual work situations and to changes in a routine work setting." (R. 439).

He rated Plaintiff the same as his previous statement, except that Plaintiff's restriction on his "ability to make judgments on simple work-related decisions" was rated as "extreme" rather than "marked." (R. 491). Next to this rating, he noted that Plaintiff's "anti-social features . . . result[] in significant challenges in compliance." (*Id.*). He also noted a problem with kleptomania. (*Id.*).

### 4. Hearing Testimony of Dr. John Sabow

At the hearing, Dr. John Sabow testified as a medical expert regarding Plaintiff's neurological health. (R. 66–71). He testified that Plaintiff's left arm tremor may be an early sign of Parkinson's disease. (R. 68). However, even if that were the case, Dr. Sabow stated that Plaintiff would "not meet the criteria for any listing." (*Id.*). He testified Plaintiff did not have any other neurological problems. (*Id.*). He further stated that, in terms of work restrictions connected to the tremor, it "would be a problem" if Plaintiff were required to do "fine manipulation in both hands," such as typing. (R. 70). Dr. Sabow stated, however, that Plaintiff could perform "manual labor" using his left hand. (R. 70–71).

### 5. Hearing Testimony of Dr. Richard Cohen

Dr. Richard Cohen then testified at the hearing as a medical expert in the field of psychiatry. (R. 71–77). He based his opinion on "the file regarding [Plaintiff's] medical condition" and Plaintiff's "testimony at [the] hearing." (R. 72). He testified that Plaintiff has antisocial personality disorder, with "an underlying paranoid substrate." (R. 73). Additionally, Plaintiff has PTSD and depression. (*Id.*). Dr. Cohen also opined that Plaintiff has low average intelligence, his "concentration, persistence, and pace is mildly impaired," and his social functioning is "markedly impaired with his anger issues." (R. 74). He also noted that Plaintiff's ability to "adapt[] and manag[e] himself" is "moderately impaired." (*Id.*). While Plaintiff displayed the ability to maintain concentration and navigate his day to day life, this ability is undercut by his "irritability." (*Id.*).

Dr. Cohen testified that Plaintiff "would have . . . difficulty functioning in a work environment because of his problems and difficulties dealing with other people, and that would be the main issue." (R. 75). He "could do a job that required very little contact with the public, coworkers, or supervisors." (*Id.*).

Dr. Cohen did not fully agree with Dr. Davis's assessment of Plaintiff's abilities. (R. 75). Dr. Cohen testified that while Dr. Davis "checked all marked in everything" and "the treatment made it seem like [Plaintiff] couldn't do anything" but that is "really not the case reading everything. His big problem is social functioning." (*Id.*). He remarked that Dr. Davis's "treatment notes did not support [Plaintiff's] functional limitations." (*Id.*). Dr. Cohen opined that Plaintiff's ability to remember in order to follow instructions at work is "not an issue." (R. 76).

### D. Hearing Testimony from Vocational Expert

At the hearing, vocational expert ("VE") Amy Leopold testified that Plaintiff did not have previous substantial gainful work activity. (R. 78–79). ALJ Barry then gave VE Leopold the following scenario:

> [P]lease assume that the claimant is able to lift and carry 25 pounds frequently, 50 pounds occasionally; is able to sit, stand, and walk six hours each in an eight-hour work day; would never climb ropes, ladders, or scaffolds; frequently climb ramps and stairs; frequently balance, bend, stoop, crouch, crawl, and kneel; occasional use of hand controls with the left hand; able to finger and manipulate frequently with the left hand; would have only occasional contact with supervisors and coworkers and no contact with the general public. Are there jobs in the regional economy, of a hypothetical individual the same age, education, and work experience as the claimant, that would be available under this RFC?

(R. 79). VE Leopold replied that there were "medium positions" that would "fit that hypothetical," including the "position of a hand packager," "janitor," and "warehouse worker." (R. 79–80). These jobs are all unskilled. (R. 80). There are 151,000 positions of these jobs nationally. (*Id.*).

Plaintiff's counsel then asked VE Leopold to imagine that "the person was going to lose his temper once a week. Would that preclude the person from performing these jobs?" (R. 81). VE Leopold replied that the hypothetical was "really vague for [her] to answer." (*Id.*). ALJ Barry opined that "it would depend on the level of temper," and VE Leopold replied: "Yeah. And that's just too subjective for me to – I'm not comfortable answering that. I'm not sure I could answer that for you." (R. 82). Plaintiff's counsel then asked VE Leopold to imagine the person "would be screaming and swearing for a period of about 10 minutes," and VE Leopold replied that "if that was done on a regular basis, I would say it would be difficult for him to sustain employment" but that "it would really depend on the frequency of outburst and the regularity of it." (R. 82–83).

### E.     The ALJ's Decision Denying Benefits

On February 7, 2018, the ALJ issued a decision denying Plaintiff's claim. (R. 10–17). In reaching that conclusion, the ALJ applied a "five-step sequential evaluation process for determining whether an individual is disabled."[8] (R. 10). The ALJ's analysis at each step is summarized below.

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since March 26, 2015, the date of his application. (R. 12). At step two, the ALJ determined that Plaintiff had the following severe impairments: "[r]esting tremor left arm, early familial or early Parkinson's; personality disorder; Attention Deficit Hyperactive Disorder

---

[8] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

(ADHD); Post-Traumatic Stress Disorder (PTSD); depression, [and] intermittent explosive disorder." (*Id.*).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*). As to Plaintiff's left arm tremor, the ALJ noted that he gave great weight to Dr. Sabow's testimony that "it does not reach a severe level at this point." (*Id.*). As to Plaintiff's mental impairments, the ALJ found that when "considered singly and in combination," they do not "meet or medically equal the criteria listings 12.04 and 12.06." (*Id.*).

### 1.    Plaintiff's Residual Functional Capacity ("RFC")

Because Plaintiff's impairments did not meet or equal a listed impairment at step three, the ALJ then assessed Plaintiff's RFC.[9] The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record." (R. 15).

In support of the finding and the overall RFC, the ALJ outlined specific items in Plaintiff's medical and treatment history, and assigned the following weights to the various medical opinions contained within the record regarding Plaintiff's limitations:

1. The ALJ gave "significant weight" to Dr. Noia's opinion that Plaintiff "has mild limitations attending to and maintaining a routine and schedule," as well as "moderate limitations on making appropriate decisions, and difficulty relating to and interacting well with others" because his opinion was "consistent with the medical evidence of record." (R. 15).

---

[9] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

2. The ALJ gave "significant weight" to Dr. Lorenson's opinion that Plaintiff "has moderate restrictions on handling small objects, pushing, pulling and reaching with the left upper extremity" because "it is consistent with the medical evidence of record." (*Id.*).

3. The ALJ gave "great weight" to Dr. Cohen's testimony regarding Plaintiff's impairments because it came "from an impartial expert who was able to review the medical evidence and is familiar with SSA rules and regulations." (*Id.*).

4. The ALJ gave "great weight" to Dr. Sabow's testimony that Plaintiff "would have difficulty using his left hand on a regular basis" because "it comes from an impartial expert who was able to review the medical evidence and is familiar with SSA rules and regulations." (*Id.*).

5. The ALJ gave Dr. Davis's opinion "partial weight, as it notes areas in which the claimant has limitations, but the limitations are not as severe as Dr. Davis opines," as seen in Dr. Davis's treatment notes. (R. 15–16). The ALJ notes that the "treatment records do not support the extreme limitations given for the claimant's conditions by Dr. Davis." (R. 16).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c)" with the following exceptions:

> [C]laimant can sit stand and walk six hours each in an eight hour work-day; cannot climb ladders, ropes, or scaffolds; can frequently do postural activities and climb ramps and stairs; can occasionally use hand controls with the left hand; can finger and manipulate with the left hand frequently; can have occasional contact with supervisors and coworkers and no contact with the general public.

(R. 13).

## 2. Steps Four and Five

At step four, the ALJ determined that Plaintiff had "no past relevant work." (R. 16). At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*). To support this finding, the ALJ relied on the opinion of VE Leopold, who testified that—given Plaintiff's RFC and limitations—he would be

able to perform the requirements of hand packager, janitor, or warehouse worker. (R. 16–17). The ALJ determined that VE Leopold's testimony was "consistent with the information contained in the Dictionary of Occupational Titles." (R. 17). Accordingly, the ALJ found that "claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act." (*Id.*).

## III.  DISCUSSION

### A.  Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court can reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.  Analysis

Plaintiff argues that the Commissioner erred in two ways in denying his claim. Specifically, he claims that the Commissioner failed to properly: (1) "evaluate Plaintiff's credibility and subjective complaints of disabling symptoms" and (2) "evaluate and apply the Vocational Expert's testimony." (Dkt. No. 11, at 13, 15).

### 1.     Plaintiff's Subjective Complaints

Plaintiff argues that "[t]he ALJ erroneously concluded that Plaintiff's allegations regarding the intensity, persistence, and limiting effects of her[10] [sic] symptoms were 'not entirely consistent with the medical evidence.'" (Dkt. No. 11, at 14 (quoting R. 15)).

An ALJ "must determine whether a claimant who has a severe impairment nonetheless has the [RFC] to perform work available to him." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1520, 404.1560). A claimant's RFC is "the most [he] can do despite [his] limitations." *Id.* (quoting 20 C.F.R. § 416.945(a)(1)). "In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms" including "pain and descriptions of other limitations." *Lisa R. v. Comm'r of Soc. Sec.*, No. 18-cv-763, 2020 WL 210273, at *4, 2020 U.S. Dist. LEXIS 5796, at *11 (N.D.N.Y. Jan. 14, 2020) (citing 20 C.F.R. §§ 404.1545, 416.945). The ALJ "is not required to accept the claimant's subjective complaints without question" and may "exercise discretion in weighing . . . the claimant's testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49 (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).[11]

The ALJ employs a two-step process to evaluate the claimant's reported symptoms: 1) the ALJ determines if the claimant has medically determinable impairments that could produce

---

[10] Plaintiff's brief repeatedly refers to Plaintiff as "her." The record reflects that Plaintiff is male. (R. 86).

[11] Plaintiff argues that the ALJ determines a claimant's "credibility," and cites to Social Security Rules ("SSR") 96-7p, 1996 WL 374186. (Dkt. No. 11, at 14). As Defendant notes, SSR 96-7 has been superseded by SSR 16-3, 2017 WL 5180304, 2016 SSR LEXIS 4, "which eliminated the use of the term 'credibility' from the [SSA] regulatory policy, and clarified that an ALJ's evaluation of a claimant's subjective assertions regarding [his] symptoms is not intended to be an examination of the claimant's character." *Adriane W. v. Comm'r of Soc. Sec.*, No. 18-cv-0187, 2019 WL 1988747, at *2 n.2, 2019 U.S. Dist. LEXIS 75785, *6 n.2 (N.D.N.Y. May 6, 2019). Instead, "the ALJ's goal is to assess the degree to which the claimant's allegations are consistent with other evidence in the record." *Id.* Despite eliminating the term "credibility," "the standard for evaluating subjective symptoms has not changed in the regulations." *Id.,* 2019 WL 1988747, at *10 n.3, 2019 U.S. Dist. LEXIS 75785, *28 n.3.

the alleged systems; and 2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 416.929(a); *Genier*, 606 F.3d at 49. In so doing, the ALJ considers factors such as the claimant's "daily activities" and the "location duration, frequency, and intensity of [their] pain or other symptoms." *Adriane,* 2019 WL 1988747, at *9, 2019 U.S. Dist. LEXIS 75785, at *28 (quoting *Del Carmen Fernandez v. Berryhill*, No. 18-cv-326, 2019 WL 667743, at *9, 2019 U.S. Dist. LEXIS 26105, at *26 (S.D.N.Y. Feb. 19, 2019) (alteration in original)). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 249 (N.D.N.Y. 2013).

Here, the ALJ applied the two-step process and found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 15). Thus, the ALJ provided at least some reasons for his conclusion. In reaching this conclusion, however, the ALJ assigned the opinion of Dr. Cohen, the non-examining psychiatrist who testified as an expert at the hearing based on his review of Plaintiff's medical records "great weight"; the opinion of Dr. Noia, who performed a consultative psychological examination, "significant weight"; but the opinion of Dr. Davis—Plaintiff's treating psychologist—only "partial weight." (*Id.*).

Plaintiff argues that Dr. Davis's objective evidence supported "Plaintiff's subjective allegations," and thus his subjective allegations should have been given "great weight." (*Id.* (citing *Marks v. Apfel*, 13 F. Supp. 2d 319, 323 (N.D.N.Y. 1998))). Defendant responds that the ALJ "set forth his rationale, by observing that plaintiff's disability allegations were at odds with several expert medical opinions, the examination and treatment notes, and plaintiff's unrestricted activities of daily living." (Dkt. No. 13, at 5).

The Court agrees with Defendant that the ALJ set forth his rationale, including analysis of the weight he assigned to various medical opinions and his consideration of treatment notes and Plaintiff's capacity in his everyday life. (R. 13–16). Nonetheless, in order to determine whether the ALJ erred in determining that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence," (R. 15), it is necessary to assess whether the ALJ properly considered the treating physician rule when determining what weight to assign Dr. Davis's opinion.[12]

When evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). The "treating physician rule" requires that "the opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given

---

[12] Defendant asserts that Plaintiff's argument that Dr. Davis's opinion is supportive of Plaintiff's subjective allegations is "undeveloped" and as such, is "waived." (Dkt. No. 13, at 7). The Court disagrees. Plaintiff contends that the ALJ "erroneously concluded that Plaintiff's allegations regarding" his symptoms were "not entirely consistent with the medical evidence," (Dkt. No. 11, at 14), and in his brief recounts the evidence regarding Plaintiff's regular treatment with Dr. Davis over a period of more than two years as well as Dr. Davis' opinion regarding the limitations Plaintiff's mental impairments place on his ability to work (*Id.* at 6–9). Plaintiff further argues that Dr. Davis's opinion was "supportive" of Plaintiff's subjective symptoms, and such objective corroborative evidence "normally entitles such subjective evidence to 'great weight.'" (*Id.* (citing *Marks*, 13 F. Supp. 2d at 323)). Thus, to assess whether the ALJ erred in determining that Plaintiff's subjective symptoms were "not entirely consistent" with the "medical evidence," the Court must evaluate how the ALJ weighed and evaluated the medical evidence. (R. 15). This implicates the treating physician rule.

'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting *Burgess*, 537 F.3d at 128). "Deference to such medical providers is appropriate" because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ decides not to give the treating source controlling weight, then he must "'explicitly consider' the following, nonexclusive '*Burgess* factors': (1) the frequen[cy], length, nature, and extent of the treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95–96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

  If an ALJ fails to assign a treating physician's opinion "controlling weight" and does not explicitly consider the *Burgess* factors, this is "procedural error." *Estrella*, 925 F.3d at 96; *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error."). If the ALJ committed procedural error and has not provided "good reasons" for the weight given to a treating physician's opinion, the court is "unable to conclude that the error was harmless" and should "remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). "If, however, 'a

searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,' [the court] will affirm." *Id.* (quoting *Halloran*, 362 F.3d at 32).

Plaintiff has seen Dr. Davis for "about two and a half years" and currently sees him on a "monthly basis." (R. 50). Under Social Security Administration regulations, acceptable medical sources include "[l]icensed psychologist[s]."[13] 20 C.F.R. § 404.1502. The regulations define a "treating source" as an "acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 404.1527)(a)(2). Accordingly, though the ALJ's decision does not explicitly reflect the fact that Dr. Davis qualifies as a treating physician, as a licensed psychologist who has treated Plaintiff continuously for over two years, the Court assumes that the ALJ considered Dr. Davis to be a treating physician.[14]

As such, the ALJ was required to either assign Dr. Davis's opinion controlling weight, or "explicitly consider" the *Burgess* factors. *Estrella*, 925 F.3d at 95–96. The ALJ only assigned Dr. Davis's opinion "partial weight," (R. 15), and after doing so, failed to explicitly articulate all of the required *Burgess* factors. While the ALJ arguably applied the second and third *Burgess* factors—the amount of medical evidence supporting Dr. Davis's opinion and the consistency of his opinion with the remaining medical evidence—he did not explicitly consider Dr. Davis's specialty, clinical neuropsychology, (R. 420), or discuss the "frequen[cy], length, nature, and

---

[13] The record reflects that Dr. Davis is a "Licensed Psychologist, NYS # 15766." (R. 420).

[14] The ALJ's failure to specify whether he was considering Dr. Davis to be Plaintiff's treating physician may be enough to warrant remand. *See Parker v. Comm'r of Soc. Sec. Admin.*, No. 18-cv-3814, 2019 WL 4386050, at *7, 2019 U.S. Dist. LEXIS 156826, at *21 (S.D.N.Y. Sept. 13, 2019) ("[B]ecause the ALJ also did not refer to [the doctor] as [the plaintiff's] 'treating physician' or state that she was applying the treating physician rule, it is impossible to know what standard the ALJ used when discounting [the doctor's] opinion" and so "[r]emand is necessary to determine [the doctor's] treatment relationship with [the plaintiff] and whether [the doctor] qualified as a treating physician.").

extent of treatment." *Estrella*, 925 F.3d at 95 (quoting *Selian*, 708 F.3d at 418). Accordingly, the Court finds that the ALJ committed procedural error. *Id.* at 95–96.

Thus, the Court must determine if "the substance of the treating physician rule" was "traversed" by examining whether the ALJ provided "good reasons" for his weight assignment. *Id.* at 96. In this case, the ALJ explained that he gave partial weight to Dr. Davis's opinion because Plaintiff's "limitations are not as severe as Dr. Davis opines, as is seen in Dr. Davis' notes in Exhibits 3F, 8F, 9F, 12F, and 19F." (R. 15–16). Additionally, the ALJ noted that "as Dr. Cohen notes, the treatment records do not support the extreme limitations given for the [Plaintiff's] conditions by Dr. Davis." (R. 16).

Given that the ALJ did not go into more detail, the Court cannot conclude whether he had "good reasons" for discounting the opinion of Plaintiff's treating physician. While Dr. Cohen testified that "Dr. Davis's treatment notes did not support [Plaintiff's] functional limitations" because "the treatment made it seem like [Plaintiff] couldn't do anything, and that's really not the case reading everything," (R. 75), the ALJ fails to explain why he gave more weight to the opinion of Dr. Cohen—who had never treated or evaluated Plaintiff—than Dr. Davis's assessment of his patient's limitations. *See Jones v. Comm'r of Soc. Sec.*, No. 10-cv-5831, 2012 WL 3637450, at *3, 2012 U.S. Dist. LEXIS 119010, at *10 (E.D.N.Y. Aug. 22, 2012) (holding that an ALJ "must give good reasons for discounting any treating physician's opinion in favor of a consultative's or non-examining doctor's").

The Court acknowledges that some of Dr. Davis's notes suggest Plaintiff limitations are not extreme. For example, in his original assessment of Plaintiff, Dr. Davis wrote that Plaintiff "describes his temper as within the normal range, and as fairly well-controlled without apparent difficulty," and noted that Plaintiff reported "a number of strengths that are positive indications

for a relatively smooth treatment process." (R. 420). However, after two years of treatment, Dr.

Davis ultimately opined that Plaintiff has "poor memory, retention of information, retrieval of

information, and application of information to achieve prosocial results." (R. 490). According to

Dr. Davis, Plaintiff's "self-regulation and self-monitoring skills are poor," he has a problem with

"impulsivity and reckless behavior," and "coupled with his disdain for authority figures and

explosive anger . . . [Plaintiff] is likely to be introduced to a secure facility before the year is

out." (*Id.*). The other medical opinion that the ALJ and Dr. Cohen relied on, Dr. Noia's, also

predates Dr. Davis's most recent assessment (by over two years). The Second Circuit has

"frequently 'cautioned that ALJs should not rely heavily on the findings of consultative

physicians after a single examination.'" *Estrella*, 925 F.3d at 98 (quoting *Selian*, 708 F.3d at

419). "This concern is even more pronounced in the context of mental illness where . . . a one-

time snapshot of a claimant's status may not be indicative of [his] longitudinal mental health. *Id.*

 Furthermore, the ALJ cited to Dr. Davis's own prior notes in justifying his assignment of

partial weight, without considering whether Plaintiff's limitations have changed over time. (R.

421–24, 435–40, 445–48). Adherence to the treating physician rule is of particular importance in

"cases concerning mental impairments, as 'cycles of improvements and debilitating symptoms

[of mental illness] are a common occurrence.'" *Sabrina H. v. Comm'r of Soc. Sec.*, No. 18-cv-

730, 2019 WL 4081330, at *5, 2019 U.S. Dist. LEXIS 147237, at *14 (N.D.N.Y. Aug. 29, 2019)

(quoting *Estrella*, 925 F.3d at 97).

 Here, while Plaintiff asserts that his subjective allegations were supported by objective

medical evidence, and therefore entitled to great weight, following a "searching review of the

record," the Court cannot conclude that "the treating physician rule was not traversed" in the

ALJ's assessment of the medical evidence. *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d

at 32). It is unclear whether the ALJ adequately considered the treating physician rule and appropriately took into account the frequency length, nature, and extent of Dr. Davis's treatment of Plaintiff in assigning his opinion of Plaintiff's limitations only partial weight. *See Parker*, 2019 WL 4386050, at *4, 2019 U.S. Dist. LEXIS 156826, at *13 ("Remand is especially important where the ALJ discounts a physician's report that 'is significantly more favorable to the claimant than the evidence considered.'" (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)). Given the ALJ's failure to properly apply the treating physician rule, his evaluation of Plaintiff's subjective symptoms is "necessarily flawed" because "[t]he ALJ's proper evaluation of [the treating physician's] opinions will necessarily impact the ALJ's credibility analysis." *Mortise v. Astrue*, 713 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2010); *see also Rivera-Cruz v. Berryhill*, No. 16-cv-2060, 2018 WL 4693953, at *8, 2018 U.S. Dist. LEXIS 168606, at *19 (D. Conn. Sept. 30, 2018) (finding that remand was warranted on the issue of the ALJ's credibility determination because the ALJ's had failed to properly apply the treating physician rule). Accordingly, the Court remands for the ALJ to "comprehensively set forth [its] reasons." *Id.*

### 2. Remaining Argument

As remand is required, the Court does not reach Plaintiff's remaining argument that the ALJ "erroneously failed to properly evaluate and apply the Vocational Expert's testimony." (Dkt. No. 11, at 15).

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order;

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: February 5, 2020
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge